**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **JON A. COLE** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **CIVIL ACTION NO. 4:16-CV-198-KOB** |
| | ) | |
| | ) | |
| **NANCY BERRYHILL,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION**

## I.     INTRODUCTION

On May 9, 2012, the claimant, Jon Cole, protectively applied for disability and disability insurance benefits under Title II and Title XVI of the Social Security Act. In both of his applications, the claimant originally alleged disability beginning May 15, 2009 because of a learning disability, scoliosis, a bad right ankle, and a bad back. The Commissioner denied both claims initially on June 15, 2012, and again upon reconsideration on September 7, 2012. The claimant amended in writing his alleged onset date of disability to January 1, 2013, and then at the hearing, orally amended the onset date to March 20, 2013. Following the 2012 denials of his claim, the claimant then filed a written request for hearing before an Administrative Law Judge

on September 17, 2012. The hearing before the ALJ occurred by video-conference on April 8, 2014. (R. 37, 57, 84, 94, 185 - 197).

In a decision dated May 15, 2014, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for disability benefits. The Appeals Council then denied the claimant's request for review, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration. (R. 1, 14).

## II.    ISSUE PRESENTED

Whether the ALJ's finding that claimant did not meet the requirements of §12.05(C) for mental impairment because the claimant did not have a valid IQ score that fell within the applicable IQ range lacks substantial evidence.

## III.    STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for

a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
>
> (2) Is the person's impairment severe?
>
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

## V. Facts

The claimant was 50 years old at the time of the administrative hearing and had a twelfth grade education. (R. 234, 24). He previously worked as a carpet bagger at a carpet mill, a general laborer at a carpet mill, a chicken hanger at a chicken plant, and a carpet loader at a carpet mill, as well as intermittently working as a construction worker for short periods of time. (R. 269). The claimant alleged that he was unable to work because of a lifelong mental impairment of cognitive deficiency, a current back impairment related to a diagnosis of scoliosis as a teen, and a right ankle impairment related to a 1987 injury to that ankle, which was

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

surgically repaired with a pin. (R. 17). The claimant alleged he was disabled beginning May 15, 2009. (R. 185).

*Mental Impairments*

The claimant was born in July of 1967. The claimant's school records show that in the 1973-74 school year as a six-year-old first grader, the claimant earned D's in arithmetic and reading, a C in writing, and an F in spelling. On May 14, 1974, Attalla City Public Schools Department of Student Services administered the WISC to the claimant at the age of six years, nine months. The claimant obtained a score of 71 on his first WISC test. As a second grader, in the 1974-75 school year, the claimant earned a D in arithmetic, an F in reading, an A in science, an A in social studies, a D+ in writing, and an F in spelling. (R. 237).

As a third grader, in the 1975-76 school year, the school classified the claimant was as educable mentally retarded (EMR) and he began receiving special education services of an unspecified type. During his first year in special education classes, the claimant earned U's in arithmetic, reading, and spelling, and S's in language, writing, and physical education. The claimant underwent IQ testing for a second time on October 5, 1976, when he was a nine-year-old fourth grader. The claimant scored a 72 on the WISC test. Still classified as EMR for his fourth grade year, the claimant earned an A in arithmetic, B in language, B+ in reading, B- in spelling and B- in writing. In his fifth grade EMR classes, the claimant earned D's in arithmetic, language, and reading; C's in science, social studies, and spelling; and a B in writing. (R. 237).

The claimant's educational record shows that, upon entering sixth grade at Etowah Middle School in August of 1978, the school placed him in the school's general population and did not classify him as EMR or put him in special education classes. That year, the claimant earned a 79 in language arts, a C in social studies, a B in math, a B in science, an A in physical

education, and a C in reading. In seventh grade, the claimant earned a C in language arts, a 73 in social studies, a 76 in math, a C in science, a 95 in physical education, an A in industrial arts, and an A in reading. The school placed the claimant back into special education classes for his eighth-grade year, and he earned a C in English, a C in social studies, a C in math, a 67 in science, an A in physical education, and a C in art. (R. 235).

The claimant remained in special education classes until he completed twelfth grade, but was not classified as EMR as he had been in elementary school. In ninth grade, the claimant earned a 76 in English, an 84 in social studies, an 86 in math, a 76 in life sciences, a 90 in physical education, and a 38 in home economics. In tenth grade, the claimant earned an 80 in English, an 83 in math, a 76 in agribusiness, a 72 in occupational study, a 63 in single living, a 60 in health, and an A+ in physical education. In eleventh grade, the claimant earned an 83 in art, a 78 in ROTC, a 71 in American history, a 63 in agribusiness, a 60 in basic math, a 60 in English, and a 96 in physical education. In twelfth grade, the claimant earned an 86 in ROTC, a 74 in government and economics, a 74 in English, a 100 in physical education first semester, and a 91 in physical education second semester, but he received no grade in his twelfth grade math class. (R. 235).

In October 1984, the claimant took the Alabama High School Graduation Exam (AHSGE), which is required to earn a high school diploma. He passed the math portion of the test, but failed both the reading and language portions of the test. In March 1985, the claimant retook only the reading and language sections of the AHSGE, but he failed those sections again. The claimant completed twelfth grade at Etowah High School at the age of 18, but did not receive his diploma because he did not pass the AHSGE and only earned 17 of the required 20 credits required to earn a high school diploma. (R. 238, 239, 240, 248).

At the request of the Social Security Administration, in connection with his October, 2009 application for disability benefits, the claimant underwent a psychological consultative examination on June 9, 2010 with John Muller, Ph.D. During the examination, the claimant reported that he was able to handle his own personal finances, care for his own personal hygiene, help his wife with household chores, and partake in his hobby of fishing. Dr. Muller incorrectly identified the claimant as a high school graduate, and indicated in his report that no school records substantiated the claimant's assertion that he was in special education classes. (R. 475 – 776).

Dr. Muller noted that the claimant was clean; and dressed correctly for the time of year; exhibited no signs of mental or cognitive limitations, but displayed an indifferent and exaggerated attitude; and gave vague answers or no response to very simple questions. On a WAIS –IV test the claimant obtained an IQ score of 44, which Dr. Muller stated was compatible with the moderate range of intellectual disability. The claimant also scored a 56 on verbal comprehension, and 50 on working memory, processing speed, and perceptual reasoning. (R. 476-477)

Dr. Muller found this 44 IQ score invalid, because he stated the claimant had significantly failed the Rey malingering test by feigning the inability to understand questions and concepts that he should have been able to understand. Dr. Muller estimated that the claimant was functioning in the moderate range of intellectual disability, but has borderline functional capabilities and the ability to hold competitive employment. Additionally, Dr. Muller concluded

that the claimant had issues with polysubstance dependence arising from his past convictions for possession of a controlled substance (crack cocaine).[2] (R. 478 - 479).

On March 28, 2014, at the request of his attorney, the claimant received a cognitive functioning evaluation from Dr. John Azar-Dickens Ph. D.. Dr. Azar-Dickens noted that the claimant was dressed appropriately for time and place and was able to communicate simply; his speech was generally normal; he knew the president, the capitols of the United States and Georgia; and he stated that a year had 360 days, and did not know the number of weeks in a year. Dr. Azar-Dickens noted the claimant's educational history; records indicating that he had been in special education classes for the majority of his time in school; and the claimant's inability to pass the reading and language portions of the  graduation examination despite multiple attempts. (R. 469 – 470).

Dr. Azar-Dickens conducted a WAIS 4th edition IQ test on the claimant. The claimant received an overall IQ score of 54, a verbal comprehension score of 56, a perceptual reasoning score of 63, working memory score of 58, and a processing speed score of 65. The claimant's IQ score of 54 placed him within the IQ deficient range for overall measurable intellectual functioning. Dr. Azar-Dickens noted the 20 point discrepancy between the claimant's early childhood WAIS IQ scores and his most current WAIS test as being unusual, but likely being related to the sophistication of the testing available today compared with  the claimant's past tests. Dr. Azar-Dickens recognized that the claimant would likely be able to carry out very basic mechanical tasks and basic calculations, but would never read above a second grade level, which is all in line with the claimant's previous academic records. (R. 473). Dr. Azar-Dickens

---

[2] The claimant's disability application for which he had met with Dr. Muller was denied on July 13, 2010; he requested a hearing before an ALJ on February 11, 2011; the hearing was granted and set for August 30, 2011; and the claimant failed to appear at the scheduled hearing and his claim was dismissed. (R. 32 – 33).

diagnosed the claimant with a DSM-V diagnosis of a severe "Specific Learning Disability with Impairment in Reading and a Specific Learning Disability with Impairment in Written Expression." (R. 471, 473).

*Physical Impairments*

On September 20, 2007 during a job screening, the claimant suffered from hypertension and went to the Gadsden Regional Medical Center emergency room. His initial blood pressure was 196/102, at 76 beats per minute. The claimant reported 0/10 pain, but had left ventricular hypertrophy. The claimant had a normal EKG, no pedal edema, and normal clinical findings. (R. 519). Dr. Stephen Jones gave the claimant clonidine, and his blood pressure improved. The claimant went home with a referral for outpatient treatment with Dr. Sunil Jaiswal for his hypertension. (R. 517-519, 522).

Dr. Robert Gilbert treated the claimant for sinusitis and high blood pressure at Gadsden Regional Medical Center on December 20, 2007. The claimant reported that he had no primary care physician. Dr. Gilbert prescribed Lisinopril for the claimant's high blood pressure, and Amoxicillin and Robitussin for the claimant's sinusitis. The claimant then signed his after-care instruction sheet and drove himself home. (R. 509-515).

The claimant sought emergency treatment at Gadsden Regional Medical Center on February 5, 2008, for alleged chest pain after working out. The claimant reported that he smoked cigarettes and drank alcohol; medical providers noted that he did not take medication for any ailments; and although he had previously been given antihypertensive medication prescriptions, the claimant did not fill them. The claimant self-rated his chest pain at a 6/10. Medical providers assessed musculoskeletal chest wall pain and prescribed Lopressor for high blood pressure, Indomethacin for heart and chest inflammation, and Toradol as a pain reliever. The claimant

signed written instructions before being discharged and driving himself home. (R. 499-501, 506, 508).

On June 30, 2008, the claimant experienced symptoms of progressively worsening hypertension while working as front-end loader for Koch Foods. His employer sent him to the hospital, and his blood pressure was 159/90, but the claimant had a normal heart sound and peripheral pulse, normal joint range of motion, normal neck range of motion without tenderness, non-tender spine, negative costovertebral angle tenderness, negative cyanosis, and normal neurological findings. The claimant reported that he did not have a primary care physician to whom he reports; that he was not on any medication and that he had not been taken hypertension medication because he had run out. Dr. Michael Disney gave the claimant Clonidine for his hypertension, and his blood pressure was stabilized at 150/81. Dr. Disney informed the claimant he could return to work with no restrictions, but ordered the claimant to follow up with a doctor, monitor his blood pressure, and take his hypertension medication. (R. 488, 490-493).

At the request of Social Security Administration, Dr. Thomas Mullady conducted an internal medicine consultative examination with the claimant on April 13, 2010. The claimant reported to Dr. Mullady that he smokes one pack of cigarettes a day and occasionally drinks alcohol. For the first time in the record, the claimant alleged that the combination of his 1987 right ankle Achilles tendon injury and lower back pain associated with a diagnosis of scoliosis as a teenager interfered with his ability to do construction work and maintain his job as a chicken catcher. The claimant denied having a history of cardiovascular or pulmonary problems. His blood pressure was 135/80 at 74 beats per minute. The claimant's chest x-ray revealed a heart size at the upper limits of normal, mild fibrotic changes throughout the ling fields, no evidence of neoplasm or active pulmonary infection, and clear apices. A physical examination showed that

the claimant had a slightly decreased range of lumbar motion and absent deep tendon reflexes in the lower legs, but normal strength, balance, pulses, and sensory findings. The claimant had a normal range of motion in the neck, shoulders, hips, knees, ankles, feet, elbows, forearms, wrists, hands, and fingers. Dr. Mullady noted that the claimant had no upper extremity functional impairment, and indicated that the claimant should have no problem with lifting 10 pounds frequently, and standing or walking for at least 2 hours in an 8-hour work day. (R. 524-526, 529-531).

On July 14, 2010, Dr. Jonathan Thompson treated the claimant at Hamilton Medical Center's emergency room in Dalton, Georgia for his subjectively-estimated 8/10 sharp, non-radiating back pain that originated nine days earlier when he bent over to pick up something. The claimant had no bowel, bladder, groin, or distal neurogenic changes, and no inability to perform activities of daily living associated with his back pain. The claimant's blood pressure was 142/86 at 85 beats per minute, and he had normal heart and lung sounds. The claimant had a negative straight leg raise test; normal ability to walk on heels or toes; bilateral plantar and dorsal flexion; and intact motor and sensory functioning. Dr. Thompson noted in his report that the claimant had mild tenderness and pain with flexion in his back. The claimant was provided a brace for his back; a prescription for Lortab, for pain treatment; and a prescription for Robaxin, for muscle spasms. (R. 394 – 398).

Dr. Terence Duffy treated the claimant at Hamilton Medical Center's emergency room, on August 6, 2010, for subjectively-reported chronic back pain at 8/10 radiating to his right leg that flared up that morning without precipitating injury. The claimant informed medical providers that he had not followed up with doctors referred to him from his 7/14/10 visit for back pain because "it's a disability thing." (R. 392). Dr. Duffy assessed the claimant's blood pressure

at the normal range, and he gave no indication of problems with either his heart or lungs. The claimant had a negative straight leg raise test; normal ability to walk on heels or toes; bilateral plantar and dorsal flexion; and intact motor and sensory function. The emergency room report notes the claimant's mild tenderness and pain with flexion in his back. Dr. Duffy referred the claimant to Doctors Frix and Bunker for further consultation about his back pain. The claimant signed his treatment form to indicate he would comply with the referral. Dr. Duffy prescribed Prednisone, for inflammation, Ultracet, for pain management, and Robaxin for muscle spasms. (R. 388 – 393).

Dr. Jeffrey Blackmon treated the claimant at Hamilton Medical Center for self-assessed sharp back pain radiating to the lower right extremities, on December 27, 2010. The claimant reported that his back pain began a month prior while walking. The claimant stated that he had not been on any medication for a year and that he did not recall any doctors ever prescribing hypertension medication to him. His blood pressure had improved from his previous visit, but was 180/104; his primary diagnosis was back pain NOS; his secondary diagnosis was a probable herniated disk in the neck or lower back, with radicular syndrome of the legs. Dr. Blackmon instructed the claimant to avoid lifting over 10 pounds, to follow up with Dr. Kahn for help with his blood pressure, and to follow up with Dr. Bunker for his back pain. The claimant was discharged with prescriptions for Medrol Dosepak for inflammation, HCTZ for high blood pressure, Flexeril for muscle spasms, and Lortab for pain. (R. 382 – 387).

On April 1, 2011, Dr. Jonathan Thompson treated the claimant again at Hamilton Medical Center for back and right leg pain precipitated by an unspecified injury two years earlier, with reported 2/10 pain on the pain scale. Dr. Thompson assessed the claimant's vitals as normal, with blood pressure of 163/89 and reported mild tenderness in his back. Dr. Thompson

diagnosed him with back strain NOS, and back pain NOS, and prescribed Lortab Medrol Dosepak, Flexeril, and Mobic for pain management and spasm reduction. Dr. Thompson also referred the claimant to Dr. Bunker for the third time and then discharged him.  (R. 372 – 377).

Dr. Jeffery Cohen treated the claimant on May 16, 2011, at Hamilton Medical Center for back and right leg pain caused by lifting weights hours earlier, with pain estimated at 10/10 on the pain scale. The claimant stated that his previous treatment with pain medication, muscle relaxers and steroids during his April 1, 2010 visit to Hamilton Medical Center for the same back issue had helped him a lot. Dr. Cohen's physical examination of the claimant showed normal vital signs, and Dr. Cohen diagnosed him with back strain NOS; then prescribed Lortab Prednisone and Robaxin for pain management, inflammation and musical spasms. The claimant received a referral to Dr. Norman to follow up with about his back pain. (R. 370 – 373).

On June 26, 201l, Dr. Shawn Holsorback treated the claimant at Hamilton Medical Center's emergency room for a reported flare up of sharp non-radiating back pain that began the previous evening after lifting a heavy object. The claimant described the pain as the same type of sharp back pain he has previously experienced that prompted him to seek medical treatment in the past. On examination, the claimant was oriented to time and place in no acute distress, but had hypertension and reported pain with back flexion and mild tenderness in the right Para-spinous muscles. The claimant received a diagnosis of back pain NOS, and Dr. Holsorback gave him Lortab and Robaxin for pain, as well as a referral to Dr. Wilson to follow up with on back pain management before being discharged from the emergency room's care. (R. 417 – 421).

The last time the claimant went to Hamilton Medical Center's emergency room for treatment was on July 31, 2011 when he saw Dr. John Marshall for sharp radiating back pain that began that morning without precipitating injury, and that the claimant estimated to be 10/10 on

the pain scale. The claimant reported tenderness down the vertebral column, with palpitation in the paralumbar and lower thoracic areas. Additionally, he reported pain in the lower back with pressure on the right side, but reported no radicular pain. The claimant had normal findings, including intact motor and sensory findings, normal extremities, and normal heart and respiratory findings. Dr. Marshall diagnosed the claimant with back pain NOS, and back strain NOS, and gave him a prescription for Lortab to manage his back pain. Additionally, Dr. Marshall advised him to ice his back and alternate prescribed pain medication with Ibuprofen. Emergency room staff instructed the claimant that he must attend his follow-up appointment scheduled the following month, and then discharged him. (R. 366 – 369).

The record gives no indication that the claimant kept any referral appointments, or returned to Hamilton Medical Center for a follow up appointment regarding his persistent back pain.

The claimant initiated treatment at Redmond Regional Medical Center emergency room in Rome, Georgia for the first time On January 20, 2014. He reported to treating emergency room physician Dr. Angela Coleman that he had lumbar pain after lifting a heavy car battery that morning. The claimant characterized the reported pain as severe, stating that it was exacerbated by movement, relieved by nothing, and that it radiated down his right leg. The claimant was oriented to time and place; was able to walk and talk well; and had normal vital signs despite his blood pressure being elevated at 189/93. The medical records from this visit make no mention of a history of hypertension, despite his high blood pressure. Dr. Coleman only diagnosed him with a strained back and provided Dexamethasone Sodium Phosphate and Ketoroloac Tromethamine to help him manage back pain and spasms. After taking both medications while in the emergency

room, the claimant reported his back pain as 2/10. Dr. Coleman discharged the claimant with prescriptions and instructions to obtain outpatient treatment for his back pain. (R. 601-605).

The claimant returned to Redmond Regional Medical Center, on January 22, 2014, for emergency treatment for self-reported severe chronic lower back pain that is exacerbated by movement. The treating physician, Dr. Terri Byars, reported the claimant's blood pressure was elevated at 186/98. Dr. Byar's report indicates lumbar muscle tenderness in the claimant, but his detailed physical and mental findings were otherwise negative. Dr. Byars informed the claimant that he cannot provide pain management narcotics daily (he had visited for back pain two days before) and that he should obtain pain management with an outside provider for chronic pain treatment. The claimant received no drug treatment from Redmond Medical Center personnel, but was given a referral to a pain clinic near him before he was discharged. (R. 596-600).

On February 6, 2014 the claimant again sought emergency medical treatment at Redmond Regional Medical Center. The treating physician, Dr. Mark Cousineau, noted in his report that the claimant complained of severe chronic lower back ache, which he placed at 3/10 on the pain scale. The claimant's vitals were normal, and in line with previous visits to the emergency room for back pain. The claimant was in no acute distress; had normal and full range of motion; had no midline vertebral tenderness, no paraspinal tenderness, and no muscle spasms. Dr. Cousineau noted the claimant's negative straight leg raising test and that the claimant was alert and oriented to time and place and had normal speech, no motor deficits, no sensory deficits, normal gait, normal mood and normal judgement. Dr. Cousineau's diagnosis was back pain and the claimant received no pain drug treatment, but did receive a referral to the same pain clinic to which he was referred on January 22, 2014. (R. 591 – 595).

The claimant made his last trip to the emergency room in the record on March 22, 2014, returning to Redmond Regional Medical Center. The claimant complained of chronic lumbar pain. The claimant's physical examination revealed a blood pressured of 197/99, but Dr. Angela Coleman's detailed medical findings were otherwise negative. Dr. Coleman diagnosed the patient with lumbar strain, and subsequently discharged him home without treatment. (R. 586 – 590).

*ALJ Hearing*

At the hearing on April 8, 2014, the claimant first testified about his work history. The ALJ initially questioned the claimant about why he stopped working on January 18, 2012, to which the claimant answered that he had been terminated because of his incarceration for driving without a license.[3] The claimant stated he was simply a laborer, doing "grunt work, moving stuff," whether at the carpet mill or chicken factory. At the carpet mill, he put rolls of carpet in plastic bags, and at the chicken factory he hung live chickens on conveyer belts. The claimant testified that he can no longer do this kind of work because he cannot bend over for very long or else his "back hurts extremely awful bad." The claimant explained that his past employment was difficult because he had problems with lifting objects heavier than a sack of potatoes; his back locks up, muscles tighten, and he has painful muscle spasms. The claimant stated that the pallets he had to lift for his 2013 job were regularly 70+ lbs., which exacerbated his back problems and lead to him not being employable any longer as a laborer. (R. 62, 65-66).

The claimant was able to find employment following his short period of incarceration, but informed the ALJ that this employment ended in March 2013 because the company he

---

[3] The ALJ questioned the claimant if he had been in prison previously. The claimant informed the ALJ he had been in prison for a probation violation, and that he was still on probation for something that had occurred twenty years earlier without elaborating on specifics. (R. 60).

worked for no longer needed his services after their contract ended. The claimant explained to the ALJ that regardless of his employment running out because of the contract, he would not be able to work for them today because of his mental and physical impairments. The claimant told the ALJ that his job in 2013 involved picking up and stacking pallets, but that the work caused bad back and ankle pain and that he could not do the job now given his current pain levels. (R. 64-65).

When asked how the claimant was able to get jobs despite an inability to read or write, the claimant explained that his wife had to fill out his job applications, and that while he gets most of his jobs through a temp service, his wife is the one who has to actually get him the job. (R. 66).

The claimant then testified about his education history. He explained how he had been in special education classes beginning in second grade, and that, although he received individualized and special help, he never learned how to read. The claimant then explained that because of this chronic illiteracy he could not fill out a job application; had to take an oral driver's license test; could not live alone; could not plan a budget or could not pay bills on time; and could not find advanced employment beyond mere physical menial work. (R. 60-61).

Regarding his medical history, the claimant explained that he does not have a doctor now, nor has he had a doctor in the past because he has never had insurance and does not have the money to afford a doctor. When asked why he did not use the money he made from work to afford a primary care physician, the claimant responded that he "had bills to pay" and "it took all he had just to make ends meet." The claimant explained how his back hurts all the time, locks up on him, and radiates all the way from his lower back down through his right ankle, with sharp stabbing pain that hurts so bad at times he has no choice but to go to the emergency room and

seek help. In addition to his chronic back pain, the claimant explained how his right ankle hurts because of the steel pin in his ankle from his Achilles tendon surgery. The claimant stated that his ankle pain limited his mobility to the point where he can only walk for a block and a half at most before he begins to experience sharp pain. (R. 63-64).

The ALJ then turned his inquiry towards the vocational expert present, Rodney Goldwyn. The ALJ asked the vocation expert to assume a hypothetical individual for the purposes of the question he was about to pose. Physically the hypothetical individual was the same age, education, and had the past relevant work experience as the claimant, with the residual functional capacity to perform light work; but with postural movements limited to the occasional level. Psychologically, the hypothetical individual can understand, remember and carry out simple instructions; make work related judgements required of unskilled work; can respond appropriately to supervision, coworkers, and work situations; can have contact with coworkers on a frequent basis; but can rarely have contact with general public; and cannot read or write. After laying out the characteristics and qualifications of this hypothetical individual, the ALJ asked the vocational expert whether any jobs in the regional or national economy would fit this hypothetical person's qualifications. (R. 69).

The vocational expert testified that a hypothetical worker of the same mental and physical abilities, work experience and educational level of the claimant would have access to about 4000 jobs within a 200-mile radius of his home in Rome, Georgia, and that 440,000 such jobs existed in the overall national economy. The vocational expert classified the claimant as being suited for a job with a residual functional capacity of light work, such as a hand packer. When asked how many of the jobs within a 200-mile radius of the claimant would require him to pass the Georgia work readiness test to be employable, the vocational expert did not know but

said it was unlikely to be an issue because many employers do not use that test. The vocational expert further explained upon questioning that less than half of the jobs in that 200-mile radius require literacy. The vocational expert stated that from his own personal observation, the assembly line jobs that fit the claimant's skill level only require minimal instruction reading to be successful. (R. 69-70).

*ALJ Opinion*

On May 15, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2014, and had not engaged in substantial gainful activity since his alleged onset date of March 20, 2013. (R. 18-20).

Next, the ALJ found that the claimant had the severe impairments of "essential hypertension with recurrent noncompliance; rule out history of learning disorder; rule out borderline intellectual functioning; history of 1987 right ankle surgical repair; and rule out back pain NOS/back strain NOS." The ALJ stated that these impairments may impose more than minimal limitations on the claimant's ability to engage in work-related decisions. (R. 20).

The ALJ next found that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1. (R. 20).

The ALJ considered whether the claimant met the criteria for Listing §12.05, relating to mental disorders and cognitive deficits, but found no reliable evidence that established that the claimant has a valid IQ of 70 or below. The ALJ stated that the record did not establish disorientation, perceptual or thinking disturbance, memory disturbance, mood disturbance, personality disturbance, emotional liability with impulsivity, or marked or severe limitations.

The ALJ concluded that the claimant only had mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence or pace; and no extended episodes of decompensation. The ALJ noted that the claimant alleged illiteracy, but dispensed with that allegation by noting that the claimant had previously reported on multiple occasions that he could read and write, and "neither medical nor academic records support allegations of illiteracy." (R. 20- 22).

Next, the ALJ determined that the claimant has the residual functioning capacity to perform at least unskilled light work, as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with the following non-exertional, function limitations: occasional postural maneuvers; frequent interaction with supervisors or co-workers; rare interaction with the public; infrequent adaptation to routine workplace changes; and no reading or writing. (R. 22).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical, educational, and work records. The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and 416.927 and SSRs 96-5p, 96-6p, and 06-3p. (R. 23). The claimant alleged disability from all work at the level of substantial gainful activity because of a learning disability, scoliosis, bad back, hypertension, a pin in the right ankle, alleged illiteracy, and listing-level cognitive deficits. (R. 23). The ALJ concluded that the claimant's medically determinable impairments could cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible when compared with the evidence in the record.

Regarding the claimant's alleged cognitive impairments, the ALJ noted that objective IQ and educational records reflect IQ scores above the listing's requirement of 70 or below; the claimant had highly variable school performance, attendance, and diligence with grades ranging

from A to F, but generally passed most subjects with at least a C grade. The ALJ also noted that the claimant had been in special education classes, but that the record contained no specific reason for why he was placed in those classes, and noted that regardless the claimant still graduated from 12th grade in his 12th year of schooling having never been held back. (R. 41). Additionally, the ALJ looked at the claimant's work history and concluded that, despite alleged inability to find work because of his learning disability, the record showed that the claimant was able to get hired frequently in substantial gainful jobs. (R. 41).

Regarding the claimant's alleged physical impairments, the ALJ found that the medical record showed the claimant could do medium work, noting essentially normal physical examination findings, an absence of scoliosis, an absence of right ankle dysfunction, normal independent gait, nearly normal lumbar range of movement, nearly normal untreated blood pressure on physical examination, and no evidence of end organ damage from hypertension. The ALJ specifically noted that, prior to his 2010 disability allegations, medical providers' reviews of the claimant's medical history reflected only hypertension and remote tendon surgery/Achilles surgery, with repeated reports of 0/10 pain; but, since then, the claimant has mostly reported chronic back pain with no precipitating incident besides alleging the back pain is related to an adolescent diagnosis of scoliosis, which is not supported by any medical evidence in the record. (R. 38 – 39).

Regarding Dr. John Muller's consulting, examining opinion, the ALJ accorded great weight to his June 2010 opinion that found the claimant was malingering on the IQ test based on clinical and test findings. The ALJ agreed with Dr. Muller's finding of borderline intellectual functioning based on clinical findings and information about the claimant's actual functioning, including his ability to engage in competitive employment, his ability to focus on his hobbies,

and his stated ability to manage funds, among other things. The ALJ found that Dr. Muller's findings were consistent with the claimant's remote IQ test scores at ages 6 and 9. Additionally, the ALJ accorded great weight to the opinion of the psychiatric consultant, Dr. Sylvia Robles-Meyers, who reviewed the available evidence on July 13, 2010 and opined that the claimant would have no difficulty with simple work instructions, but would have moderate limitations in performing detailed work; and no difficulty sustaining concentration for two hours at a time. (R. 41, 546-559)

The ALJ gave little weight to Dr. John Azar-Dickens' 2014 evaluation of the claimant's IQ. First, the ALJ noted the absence of a specific and unequivocal endorsement of the scores' validity. Dr. Azar-Dickens stated in his report that the claimant's scores indicated a severe learning disability precluding reading above the second grade level and apparently precluding work even with accommodations. The ALJ found the 2014 IQ score of 54 incompatible with other evidence of the claimant's IQ, including childhood test scores, school performance, work performance, and generally normal psychiatric findings in the longitudinal medical record. The ALJ stated that the discrepancy between scores was not adequately explained by the inclusion of new measures, contrary to Dr. Azar-Dickens' conclusion that they were in line with academic records and the claimant's reported low-skilled work. Additionally, the ALJ noted that Dr. Azar-Dickens apparently was not aware of the claimant's history of malingering on IQ tests, his history of drug and alcohol abuse, his history of criminal convictions, or his history of independent functioning prior to his marriage in recent years. (R. 43).

The ALJ also considered the witness statement and opinions of the claimant's estranged wife; she indicated that he had extremely restricted activities, drank too much, could not complete applications without help from her, could not interact well socially, and required her

assistance for even routine daily activities among other things. The ALJ found the ex-wife's statements did not accurately reflect the claimant's abilities because of the claimant's work, medical, and educational record. The ALJ found the claimant's medical, work, and educational history were objectively more compelling than her statements about the nature of the claimant's disability, and thus accorded her statements little weight. (R. 44).

Finally, the ALJ, relying on the vocational expert's testimony, found that when considering the claimant's age, education, work experience, residual functional capacity, and vocational expert's testimony, the claimant can perform jobs that exist in significant numbers in the national economy, including working on an assembly line at the light level, where none to slight amounts of reading are required. (R. 44 – 45). Thus the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 46).

## VI.    DISCUSSION

The claimant argues that substantial evidence does not support the ALJ's finding that the claimant did not satisfy §12.05C regarding intellectual disability. This court agrees. Substantial evidence does not support the ALJ's reasons for discrediting the opinion of Dr. Azar-Dickens.

The Eleventh Circuit has determined that, for a claimant to be disabled under §12.05, "a claimant must at least (1) have significantly sub-average general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F. 3d 1217, 1219 – 20 (11th Cir. 1997). Medical Listing §12.05C requires a valid verbal, performance, or full scale IQ of 60 through 70 and another physical or mental impairment imposing an additional and significant work-related limitation of function. *Crayton*, 120 F. 3d at 1219. A claimant's IQ score of 60 – 70 must cause at least two of the following:

(1) marked restriction of activities of daily living; or
(2) marked difficulties in maintaining social functioning; or
(3) marked difficulties in maintaining concentration, persistence, or pace; or
(4) repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05C.

The Eleventh Circuit has determined that an ALJ is not required to base a finding of intellectual disability on the results of an IQ test *alone* when evaluating the requirements of §12.05(C). *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986); *see also Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984) (finding that no case law "require[es] the Secretary to make a finding of intellectual disability based *solely* upon the results of a standardized intelligence test in its determination of intellectual disability.") An ALJ is required to base a determination of intellectual disability on the combination of intelligence tests and medical reports. A valid IQ score need not be conclusive of intellectual disability when the IQ score is inconsistent with other evidence in the record concerning the claimant's daily activities and behavior. *Lowery v. Sullivan*, 979 F. 2d 835, 837 (11th Cir. 1992).

According to the Social Security Administration's listings, IQ test scores from children ages 7 to 15 are only considered valid for two years if the tested IQ score is over 40. 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(D)(10). Therefore, nearly forty years after the claimant took the IQ tests at age 6 and 9, neither test is valid and should not be used in consideration of the claimant's measured intelligence. Dr. John Muller found in his professional opinion that the claimant was malingering on his June 9, 2010 evaluation and thus no valid score emerged from that testing session. The only valid score from which the ALJ could evaluate the claimant's intellectual functioning was the 2014 score from Dr. Azar-Dickens, the only official test score on record.

According to that WAIS–IV test, the claimant's full scale IQ is 54, with a verbal

comprehension score of 56, perceptual reasoning score of 63, working memory score of 58, and processing speed of 65. Dr. Azar-Dickens noted the significant discrepancy between the claimant's previous tests for cognitive function obtained in 1974, and 1976 and the current cognitive scores, but opined that the discrepancy may be related to the sophistication of testing available today compared with past testing. Dr. Azar-Dickens did not diagnose the claimant with malingering on his cognitive evaluation. Instead, he indicated that the score was an accurate appraisal of the claimant's current abilities. In addition to the IQ score, the claimant reported a history of learning issues, and testified that he had problems with reading, comprehension, and expressive writing skills. The claimant did not receive a high school diploma, and was in special education classes from second grade until twelfth grade.

The ALJ improperly dismissed Dr. Azar-Dicken's cognitive evaluation. IQ scores from individuals age 16 and older are valid because they provide more stable results than scores from younger ages. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(D)(10). In this case, the ALJ relied heavily on Dr. Muller's malingering assessment to accord little weight to Dr. Azar-Dickens' opinion. Yet Dr. Muller did not perform a valid IQ test per his own report located in the record, and Dr. Azar-Dickens did not find that the claimant was malingering during his evaluation.

If the ALJ questioned the results of Dr. Azar-Dickens' IQ testing, the ALJ should have contacted Dr. Azar-Dickens to verify the validity of the testing, or alternatively the ALJ should have ordered additional IQ testing for the claimant. *See Berryman v Massanari*, 170 D. Supp. 2d 1180, 1185 (N.D. Ala. 2001) ("if the ALJ was in doubt as to the validity of the claimant's IQ scores, he should have sought clarification of the test results from [the doctor who performed the test] or ordered additional testing.") Instead of seeking clarification, or ordering additional IQ

testing, the ALJ concluded that Dr. Azar-Dicken's did not believe the evaluation was valid because Dr. Azar-Dickens gave no explicit statement about the validity of the IQ score, even though he did specifically diagnose the claimant within the IQ deficient range for overall measurable intellectual functioning. If Dr. Azar-Dickens did not believe the tests were valid, he would not have made that diagnosis, and nothing in his report even hints that he did not believe the score to be valid. *See Berryman*, 170 F. Supp. 2d at 1185.

Moreover, the ALJ mischaracterized the claimant's educational history. The ALJ cited the individual grades from the claimant's school records to discount Dr. Azar –Dickens' evaluation, but failed to qualify those grades as having been from special education classes in which the claimant was enrolled from second grade through twelfth grade, with the exception of the sixth grade. Moreover, the ALJ failed to consider the fact that the claimant had repeatedly failed the Alabama High School Graduation Exam and left school without the requisite number of credits required to officially graduate high school. Yet, the ALJ characterized the claimant as a high school graduate throughout his opinion.

Finally, the ALJ noted that, because Dr. Azar-Dickens "was apparently not aware of the claimant's history of malingering on IQ tests, his history of drug and alcohol abuse, and history of criminal convictions," the doctor's professional evaluation could not provide a sound basis for reliability. However, even if Dr. Azar-Dickens did not know about the claimant's complete history, this fact does not negate an otherwise valid IQ score. Perhaps neither Dr. Azar-Dickens nor the ALJ had all the facts, but the ALJ's erroneous view of the claimant's education was a greater error because the correct facts undermine his conclusion.

This court finds that substantial evidence does not exist in the record to support the ALJ's finding that the claimant's sole IQ score on record was invalid. Moreover, substantial evidence

in the record does not support the ALJ's finding that the claimant's mental impairments did not satisfy §12.05C because he did not have a valid IQ score below the Medical Listing's stated requirement of 70 or below.

VII.    CONCLUSION

For the reasons stated, this court concludes that substantial evidence does not support the ALJ's decision regarding whether the claimant meets listing §12.05C. Therefore, the court will **REVERSE** and **REMAND** the decision of the Commissioner to the ALJ for further action consistent with this opinion.

The court simultaneously will enter a separate Order to that effect.

DONE and ORDERED this 18th day of September, 2017.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE